Gidget LINCOLN, Petitioner,

v.

**INTERIOR REGIONAL HOUSING
AUTHORITY, Respondent.**

No. S–9274.

Supreme Court of Alaska.

Sept. 14, 2001.

583

Christian Bataille, Fairbanks, for Petitioner.

Tracey L. Knutson, Sisson & Knutson, P.C., Anchorage, for Respondent.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Gidget Lincoln petitioned this court for review of the superior court's grant of summary judgment, dismissing her claims against her former employer, Interior Regional Housing Authority, for violation of the Alaska Whistleblower Act, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. Because questions of fact were present as to whether Lincoln was discharged for impermissible retaliatory reasons and whether the Authority's explanation for her discharge was pretextual, we reverse the award of summary judgment to the Authority.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Interior Regional Housing Authority (Authority) is an association established under state and federal law to address housing shortages in interior Alaska. The United States Department of Housing and Urban Development (HUD) provides financial assistance to the Authority.[1]

Gidget Lincoln was hired by the Authority in March 1992 as a collection officer. A portion of the Authority's funding comes through payments by individuals buying or renting homes constructed by the Authority. Lincoln's primary responsibility was to collect delinquent payments.

HUD was notified on January 20, 1995, of " 'gross' mismanagement practices which have occurred at [the Authority] for some period and resulted in cost overruns of $2,700,000, unaccounted materials inventory, questionable procurement practices, and neglect of [the Authority's] fiduciary responsibility with its homebuyers' equity accounts estimated at $500,000." HUD scheduled an on-site review of the Authority three days later, on January 23, 1995; part of the haste stemmed from HUD's concern over reports that Authority staff had altered, destroyed, or tampered with records, and falsely certified statements.

Velma Carroll was the acting executive director of the Authority at the time of the investigation. According to Lincoln, Carroll informed her and other employees that they should not cooperate with the HUD investigation of the Authority, and that if they did, they would be subject to disciplinary action, including termination. Lincoln asserts that Authority employees Laura Henderson and Ray Kent made similar threats. Lincoln and three other employees wrote a letter to HUD prior to the investigation expressing their fear of retaliation should they divulge information regarding the Authority's practices. Lincoln cooperated with HUD investigators. Lincoln was laid off by the Authority on February 23, 1995. The letter notifying Lincoln of her layoff explained that the action was required for fiscal reasons. The letter promised that she would "be recalled as soon as fiscally possible." The Authority was in a financial crisis in early 1995. The other three employees who had been concerned about retaliation were also dismissed for various stated reasons, and some other employees were also dismissed.

The HUD investigation of the Authority resulted in the issuance of a corrective action order by HUD on March 3, 1995. HUD substantiated most of the allegations made against the Authority in January, and suspended all of the Authority's procurement, contracting, development, and architectural activities.

Lincoln informed the Authority that she wished to be considered for her position as collections officer as soon as it was reopened. She moved to Seattle later that spring, but informed the Authority that she still wanted her old job. According to the Authority's personnel policy, the Authority was required to recall Lincoln to her position or to a position for which she was qualified and for which there were no more senior applicants. In July 1995 the Authority advertised for an "Accounts Receivable/Billing Collection Clerk." Lincoln was not recalled to this position.

In August 1995 Joe Wilson, the new executive director of the Authority, wrote a letter

---

1. *See* 42 U.S.C. § 3371 (1994); 24 C.F.R. § 100.10; AS 18.55.996.

to Lincoln, offering her the opportunity to apply for a position with the Authority as a housing counselor. Lincoln responded by writing Wilson and asking whether relocation costs were included, and whether she would be required to undergo a probationary period; she also requested written assurance that she would not be subject to retaliation, and explained that she would not disclose her current employer due to her fear of retaliation. Wilson wrote Lincoln back, informing her that no moving expenses were included in the position, that she would be subject to a probationary period, that she could expect to be treated like other employees, and that her failure to disclose her current employer's identity made it difficult to process her application. Lincoln was not hired for the position.

### B. *Proceedings*

Lincoln filed suit against the Authority alleging breach of contract, including breach of the implied covenant of good faith and fair dealing, violation of the Alaska Whistleblower Act, negligent hiring and retention (of Velma Carroll and Laura Henderson), violation of her due process rights under the Alaska Constitution, and intentional and negligent infliction of emotional distress. The Authority moved for summary judgment against Lincoln on all of her claims. Lincoln cross-moved for summary judgment, asking the superior court to find that the Authority had breached its own personnel policy by failing to recall her.

The superior court issued three orders concerning the parties' summary judgment motions. The first, entered February 1999, granted summary judgment to the Authority on Lincoln's claims relating to punitive damages, breach of contract and due process. This order also denied the Authority's motion for summary judgment on Lincoln's "claim for emotional distress," and granted Lincoln's motion with regard to her claim that the Authority failed to comply with its personnel policy. The order noted that "Plaintiff will be granted broad latitude to seek specific damages and general damages beyond merely the loss of income she may have experienced . . . ."

On July 29, 1999, a second order was entered. This reiterated the earlier grant of summary judgment in favor of the Authority on Lincoln's breach of contract claim, including breach of the implied covenant of good faith and fair dealing, and her due process and punitive damages claims. The order also granted summary judgment in favor of the Authority on Lincoln's Whistleblower, negligent hiring and retention, and intentional infliction of emotional distress claims and reiterated that summary judgment in favor of Lincoln had been granted on her claim that the Authority failed to recall her in violation of its personnel policy.

On July 30 a third order was entered reiterating the July 29 order, and explaining the court's reasons. In this order the court stated that Lincoln's layoff was "in response to a legitimate budget crisis and was not pretextual." The court also stated that "even if [the Authority] was angry with Ms. Lincoln for her comments to HUD investigators, she would have been laid off anyway. . . . Other than Ms. Lincoln's allegations, there is no evidence to support her claim that she was targeted for lay-off for an inappropriate reason." Concerning Lincoln's claim on which summary judgment had been granted in her favor, the July 30 order stated: "This leaves for resolution the issue of damages arising from [the Authority's] failure to timely offer Ms. Lincoln a job once rehiring began. Plaintiff may present evidence regarding lost wages, reasonable relocation expenses, and emotional distress as a result . . . ."

We granted Lincoln's petition for review and limited review to the dismissal of her claims alleging violation of the Whistleblower Act, the covenant of good faith and fair dealing, and for intentional infliction of emotional distress.

### III. *STANDARD OF REVIEW*

■■■ This court reviews a trial court's grant of summary judgment de novo.[2] Summary judgment is appropriate "only if the record presents no genuine issues of material

---

**2.** *See Lane v. City of Kotzebue,* 982 P.2d 1270, 1276 (Alaska 1999).

fact and the moving party was entitled to judgment on the law applicable to the established facts."[3] Where the parties dispute the facts, all reasonable factual inferences must be drawn in favor of the non-movant.[4] The movant bears the burden of proving the absence of material facts.[5]

■ If the movant makes a prima facie showing that it is entitled to judgment as a matter of law on the established facts, the non-moving party must demonstrate that a genuine issue of fact exists.[6] The non-movant must present or point to admissible evidence in order to meet her burden of showing a material issue of fact.[7] The non-movant is "required, in order to prevent entry of summary judgment, to set forth specific facts showing that [s]he could produce admissible evidence reasonably tending to dispute or contradict the movant's evidence, and thus demonstrate that a material issue of fact exists."[8]

## IV. DISCUSSION

### A. Summary Judgment Should Not Have Been Granted on Lincoln's Whistleblower and Covenant of Good Faith and Fair Dealing Claims.

■ The Alaska Whistleblower Act[9] "protects public employees who report to public bodies on matters of public concern from retaliation by their employers."[10] A prima facie case under the Act consists of two elements: an employee must show that (1) she has engaged in protected activity and (2) the activity was a "substantial" or "motivating factor" in her termination.[11] An employer may rebut a prima facie case by demonstrating that the employee would have been discharged even had she not engaged in the protected activity.[12]

■ Retaliatory discharge can create a claim for breach of the covenant of good faith and fair dealing implied in at-will employment contracts.[13] The elements of retaliatory discharge are similar to a Whistleblower Act violation, and this court has adopted the three-part test used in federal Title VII employment discrimination cases to define those elements.[14] A plaintiff must demonstrate that (1) she engaged in protected activity, (2) her employer subjected her to adverse employment action, and (3) there is a causal connection between her protected activity and the employer's action.[15] This court has also held that once a plaintiff has established a prima facie case, an employer may rebut the inference of retaliation by demonstrating a legitimate, non-retaliatory explanation for the adverse employment action. If the employer rebuts the employee's prima facie case, the burden of proof shifts back to the employee to show that the employer's expla-

3. Bishop v. Municipality of Anchorage, 899 P.2d 149, 153 (Alaska 1995) (citations omitted).

4. See id.

5. See Wassink v. Hawkins, 763 P.2d 971, 973 (Alaska 1988).

6. See French v. Jadon, Inc., 911 P.2d 20, 23 (Alaska 1996).

7. See id.

8. McGlothlin v. Municipality of Anchorage, 991 P.2d 1273, 1277 (Alaska 1999).

9. AS 39.90.100 provides that:
(a) A public employer may not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because
(1) the employee, or a person acting on behalf of the employee, reports to a public body or is about to report to a public body a matter of public concern; or
(2) the employee participates in a court action, an investigation, a hearing or an inquiry held by a public body on a matter of public concern.

10. Alaska Housing Finance Corp. v. Salvucci, 950 P.2d 1116, 1121 (Alaska 1997).

11. See Methvin v. Bartholomew, 971 P.2d 151, 154 (Alaska 1998).

12. See id.; Bishop, 899 P.2d at 154–55.

13. See Norcon, Inc. v. Kotowski, 971 P.2d 158, 167 (Alaska 1999).

14. See Veco, Inc. v. Rosebrock, 970 P.2d 906, 918 (Alaska 1999).

15. See id. at 919 (citing Miller v. Fairchild Indus., Inc., 797 F.2d 727, 730–31 (9th Cir.1986)).

nation is a pretext for retaliation.[16] If the employee fails, the employer is entitled to judgment.[17]

■ How do these rules apply in a summary judgment context when the employer is the movant? If the employer claims that no prima facie case can be made, it must offer evidence showing that the employee had not engaged in protected activity, or that the activity was not a motivating factor in her termination, or that she would in any case have been terminated for other reasons. If the employer claims that the employee's discharge was not motivated by her protected conduct or that, assuming that it was so motivated, she would have been discharged in any event for other reasons, the employer must present admissible evidence establishing either or both of these claims. The employer must show there is no real dispute as to any of the critical issues. If the employer satisfies these obligations, it is entitled to summary judgment unless the employee presents or points to evidence that shows that one or more critical issues of fact are reasonably disputed.[18]

■ In the present case the Authority's brief concedes for purposes of this petition that Lincoln has established a prima facie case of retaliatory discharge:

[The Authority] has assumed arguendo, for purposes of summary judgment, that Lincoln has established a prima facie case of retaliatory discharge: (1) Lincoln cooperated with [HUD] during its on-site review and investigation of [the Authority's] financial status; (2) Lincoln was laid off

from employment; and (3) in light of the temporal proximity between the protected activity and the lay-off, the "causal link" element is, arguendo, met.

But it claims that it has rebutted Lincoln's prima facie case by showing that she was laid off for legitimate non-retaliatory reasons. Our inquiry therefore must be (1) whether the Authority has presented evidence that Lincoln was discharged for reasons other than her cooperation with HUD, and (2) whether that evidence is reasonably disputed.[19]

The Authority has presented evidence indicating that Lincoln was laid off for reasons independent of the fact that she had engaged in protected activity. It points to evidence of four circumstances justifying that conclusion. First, the Authority was in a financial crisis at the time Lincoln was laid off to the extent that it was unable to meet its entire payroll. Second, it was not acting executive director Carroll who decided to lay off Lincoln, but rather a management team that made this decision. Third, the collection officer position held by Lincoln was eliminated and after a delay of several months collections responsibility was consolidated with a bookkeeping position. Fourth, Lincoln was given the opportunity to apply for a position in the Authority five months after her layoff, thus indicating that no personal animus motivated her layoff.

While these circumstances are evidence that Lincoln was laid off for reasons independent of her Whistleblowing activity, Lincoln

---

**16.** *See id.*

**17.** *See id.*

**18.** *See Haroldsen v. Omni Enters., Inc.*, 901 P.2d 426, 431–32 (Alaska 1995) ("Has the employee raised sufficient doubts regarding the employer's stated justifications to permit a reasonable jury to infer that the reasons given are pretextual?") (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir.1993)). Another similar formulation in *Haroldsen* defining how a plaintiff in an employment discrimination case may successfully oppose a motion for summary judgment was expressed as follows:

[P]laintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-

moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext.

*Id.* at 432 (quoting *Hairston*, 9 F.3d at 921).

**19.** The Authority does not argue, at least directly, that even if Lincoln was laid off for impermissible reasons, she would have been laid off for other reasons. But the trial court relied on this ground as an alternative basis for its decision. Under the circumstances of this case, the same facts which create an inference that the grounds for laying off Lincoln presented by the Authority are pretextual also inferentially place in doubt the conclusion that Lincoln would have been laid off for independent reasons even if her actual layoff was impermissibly motivated.

has highlighted other evidence that reasonably tends to dispute this conclusion. She points to evidence that (1) management threatened her with retaliation if she cooperated with HUD's investigation;[20] (2) despite the threats she cooperated with the investigators; and (3) there was only a short period of time between her cooperation and her dismissal. We agree that the evidence of these circumstances raise a permissible inference that Lincoln was terminated for cooperating with the investigation and that therefore the reasons offered by the Authority are pretextual.[21]

Lincoln also points to evidence contradicting the Authority's position that a management team rather than acting executive director Carroll decided to lay off Lincoln. She refers to a deposition of management team member Michael Mahlen, who indicated that the team did not discuss the merits of laying off Lincoln.[22]

The fact that Lincoln's collection position was first eliminated and then consolidated with a bookkeeping position does not necessarily mean that Lincoln's layoff was not pretextual. There is evidence in the record justifying an inference that the short-term elimination of the collections position was irrational because the revenues produced by collections activities were as a consequence much reduced. Only after HUD officials pressed the Authority to hire a collections officer in June of 1995 did the Authority advertise for and hire a new employee with collections responsibility. But the new position required three years experience in bookkeeping, experience that Lincoln is said to have lacked. Nothing about this chain of events dispositively dispels the inference that Lincoln was laid off because of her protected activity. It is consistent with her theory that she was laid off for cooperating with the HUD investigation during a period of management irrationality. The fact that the collections position was redefined when it was again filled may be explained by an awareness on the part of the new management of the Authority of its duty to recall Lincoln and a belief that by changing the requirements of the position this duty might be avoided.

Likewise, the fact that the Authority eventually invited Lincoln to apply for a new position does not conclusively negate the inference that she was laid off for impermissible reasons. The invitation is also consistent with an initial pretextual layoff and a desire by new management to either eliminate future litigation as to whether Lincoln's layoff was wrongful or to strengthen the Authority's position in such litigation.

In summary, Lincoln has identified evidence that raises an inference that the reasons offered by the Authority for laying her off were pretextual. Thus there are genuine issues of material fact on this point that must be resolved by the trier of fact.

---

**20.** The fact that threats were made is not controverted. Acting executive director Carroll's notes of a management team meeting of February 13, 1995, are reflective of one such threat, as well as of the general management tone demonstrated by many of the documents in the record:

> I will not tolerate any form of insubordination from any staff member. We are to be working as a team and if anyone feels they cannot trust members of the team or work together they need to resign.
> HUD will have their reports on Friday and I do hope no other information was sent from here. And nobody is to contact any funding agency without my prior approval and if any one does it would be grounds for disciplinary actions and or termination.

**21.** See Veco, 970 P.2d at 920 ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge.") (quoting Miller, 797 F.2d at 730–31); Knight v. American Guard & Alert, Inc., 714 P.2d 788, 792 (Alaska 1986) (holding that where employee was warned not to disclose that other employees were abusing drugs on the job, and employee was terminated following disclosure, reasonable jurors could conclude that employee was terminated in retaliation for informing on other employees).

**22.** Mahlen testified:

> The other girls in the other office [other than Mahlen's secretary], even though I was supposedly over them, I never got a say in whether they got laid off or not. And certainly one of them might have been a good candidate to be laid off rather than Gidget Lincoln. Gidget was one of our greater assets in the office. I don't know of anyone who honestly could disagree with that.

B. *Summary Judgment Should Not Have Been Granted on Lincoln's Claim for Intentional Infliction of Emotional Distress.*

 The elements of a claim for IIED are: "(1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional distress, and (4) the distress is severe."[23] In claims involving IIED the trial court is required to make a "threshold determination whether the severity of the emotional distress and the conduct of the offending party warrant a claim."[24] The court's threshold determination is subject to review under the "abuse of discretion" standard.[25] In the context of this sort of evidentiary sufficiency ruling, "abuse of discretion" means that the court's decision will not be disturbed unless it is "plainly unreasonable."[26]

█ How the threshold determination requirement applies at a summary judgment stage is unclear from our case law. The threshold determination requirement was first mentioned in connection with IIED claims in *Richardson v. Fairbanks North Star Borough*.[27] There the threshold determination was made at trial following an offer of proof concerning the severity of the plaintiff's emotional suffering. Conceivably such an offer could be made and ruled on in a summary judgment context as well.[28] In resolving such a question the trial court should accept as true those facts most favorable to the plaintiff. Having thus afforded favorable inferences to the plaintiff's case, the court should decide whether the severity of the emotional distress and the conduct of the offending party warrant submission of the claim to the jury.

█ In the present case, the superior court dismissed on summary judgment Lincoln's claim for intentional infliction of emo-tional distress relating to her wrongful discharge claims. Nonetheless, the court stated that it would permit an emotional distress claim to be submitted in connection with her wrongful failure to rehire claim. This seems to indicate that the court dismissed Lincoln's IIED claims relating to her wrongful termination not because there were no fact issues concerning whether her distress was sufficient to satisfy the threshold requirement for such claims, but because the court had concluded that her wrongful termination claims were without merit in the sense that they presented no fact issues requiring further adjudication. This conclusion, as we have indicated, was erroneous. Further, our case law establishes that in some circumstances a wrongful discharge may give rise to an IIED claim.[29]

The trial court has apparently not made a discretionary threshold decision concerning Lincoln's IIED claim based on whether the Authority's conduct was sufficiently outrageous to support the claim. On remand such a determination must be made. It is also somewhat unclear as to whether the court has made a discretionary threshold determination as to whether the emotional distress Lincoln suffered was sufficiently severe. The court should also address this subject on remand. Whether the trial court decides to make these determinations in subsequent summary judgment proceedings or after receiving pretrial offers of proof is a decision committed to the discretion of the trial court.

## V. CONCLUSION

REVERSED and REMANDED for further proceedings consistent with this opinion.

---

**23.** *Chizmar v. Mackie,* 896 P.2d 196, 208 (Alaska 1995) (quoting *Teamsters Local 959 v. Wells,* 749 P.2d 349, 357 (Alaska 1988)).

**24.** *Beard v. Baum,* 796 P.2d 1344, 1350 (Alaska 1990) (quoting *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985)).

**25.** *See Richardson,* 705 P.2d at 456.

**26.** *See L.G. v. State, Dep't of Health and Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000).

**27.** 705 P.2d 454 (Alaska 1985).

**28.** *See Beard,* 796 P.2d at 1350 (reversing dismissal of IIED claim and remanding to superior court for threshold determination of severity of plaintiff's emotional distress).

**29.** *See Norcon, Inc. v. Kotowski,* 971 P.2d 158, 173 (Alaska 1999); *Cameron v. Beard,* 864 P.2d 538, 549 (Alaska 1993).